UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW BIANCHI,

Case No. 25-10949

        Plaintiff,

F. Kay Behm

v.

United States District Judge

PALO ALTO MIND BODY, *et al.*,

        Defendants.
_____ /

**CORRECTED OPINION AND ORDER ON MOTION TO DISMISS AND TO COMPEL ARBITRATION (ECF No. 6), ORDER ON MOTION TO SEAL (ECF No. 16) AND MOTION TO STRIKE (ECF No. 18)**

## I.   PROCEDURAL HISTORY

Plaintiff, Matthew Bianchi, a former employee of Defendant Palo Alto Mind Body (PAMB) initially filed this lawsuit based on an alleged breach of a settlement agreement in Wayne County Circuit Court.  (ECF No. 1). Defendants, PAMB and M. Rameen Ghorieshi, removed this matter to federal court based on diversity of citizenship.  *Id.*  Bianchi filed an amended complaint to include claims under Title VII.  (ECF No. 11).  On April 9, 2025, Defendants filed a motion to dismiss and to compel arbitration.  (ECF No. 6). This matter is fully briefed.  (ECF Nos 8, 9).  The court held a hearing on the motion on September 10, 2025.

1

For the reasons set forth below, the court finds a genuine issue of material fact regarding whether the parties entered into a binding arbitration agreement.  For this reason, the motion to dismiss and to compel arbitration is **HELD IN ABEYANCE** pending limited discovery and supplemental briefing, as explained in more detail below.

## II.    FACTUAL BACKGROUND

On September 2, 2023, PAMB terminated Bianchi's employment.  (ECF No. 6-5).  In April 2024, Bianchi filed a discrimination charge with the EEOC.  (ECF No. 6-3).  In August 2024, the parties participated in a mediation with an EEOC mediator.  According to Defendants, the parties could not come to an agreement on key terms of a settlement despite months of follow up negotiations.  Bianchi tells a different story and contends that the parties have an enforceable oral settlement agreement.

Defendants also contend that as part of his employment with PAMB, Bianchi signed a four-page "Mutual Arbitration Agreement."  (ECF No. 6-2).  According to Defendants, the agreement is a three-party contract between Bianchi, PAMB, and Insperity, a third-party company that provides payroll and human relations services to PAMB.  (ECF No. 6-4, ¶ 2).  The arbitration agreement submitted by Defendants provides in part as follows:

1. **Mutual Arbitration Agreement**. Except as this Arbitration Agreement otherwise provides, Insperity, you, and Client Company mutually agree to resolve by arbitration the following, which constitute "**Covered Claims**": (a) all claims or disputes related to or arising out of my application for employment, my employment, or the termination of my employment with Insperity and/or Client Company, (b) all claims that Insperity and/or Client Company may have against me, and/or (c) all claims that I may have against Covered Persons. "**Covered Persons**" means: (i) Insperity and its parents, subsidiaries, affiliates, and dbas, and their respective officers, directors, employees, or agents, (ii) Insperity's benefit plans, plan sponsors, fiduciaries, administrators, and their respective affiliates or agents, and/or (iii) Client Company and its officers, directors, employees, affiliates or agents. Any and all Covered Persons may enforce this Arbitration Agreement. All Covered Claims will be decided by a single arbitrator through final and binding arbitration and not by way of court or jury trial.

**A. Covered Claims**. This Arbitration Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, Covered Claims include, but are not limited to, any and all past, present, and future claims or disputes involving Covered Persons, including contract claims; tort, defamation and other common law claims; wage and hour claims, including claims relating to pay, minimum wage, overtime, overtime exemption classification, wage penalties, and meal and rest breaks; discrimination, harassment, and retaliation claims, including claims based on race, creed, color, religion, sex, age, disability, workers compensation, leave status, national origin, ancestry, sexual

orientation, marital status, veteran or military reserve status, or any other characteristic protected by federal, state or local law; claims arising under the Defend Trade Secrets Act, Fair Credit Reporting Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974), Affordable Care Act, Genetic Information Non-Discrimination Act, Uniformed Services Employment and Reemployment Rights Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, False Claims Act; and claims or causes of action arising under or relating to any and all federal, state, or local constitutional, statutory, regulatory, or common laws now or hereafter recognized.

The Arbitrator, and not any federal, state, or local court, or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability, or waiver of this Arbitration Agreement. However, the preceding sentence does not apply to the "Class Action Waiver" below. Regardless of anything else in this Arbitration Agreement or the American Arbitration Association Rules or procedures (discussed below), any dispute relating to the interpretation, validity, applicability, enforceability, unconscionability, or waiver of the Class Action Waiver may only be determined by a court and not an arbitrator.

4

(ECF No. 6-2, Ex. A, ¶ 1(A)).  According to the Arbitration Agreement, the parties  agreed to arbitrate "any and all past, present, and future claims or disputes ... including contract claims[,] tort [claims]; "wage and hour claims, including claims relating to pay," "discrimination, harassment, and retaliation claims." *Id*.  These "Covered Claims" expressly mention claims under the FLSA and Civil Rights Act, as well as "claims or causes of action arising under or relating to any federal, state, or local constitutional, statutory, regulatory or common laws now or hereafter recognized." *Id*.  Defendants maintain that claims against Dr. Ghorieshi are also covered based on the Agreement's definition of "Covered Persons," which includes "Client Company and its officers, directors, employees, affiliates, or agents." *Id*. at ¶ 1.  All Covered Persons, including Dr. Ghorieshi, have standing to "enforce this Arbitration Agreement." *Id*.

The arbitration agreement has only limited exclusions that do not appear to be at issue here, such as for workers' compensation, state disability insurance, or unemployment insurance benefits claims.  *Id*. at ¶ 1(B).  Any disagreement between the parties regarding whether the arbitration agreement covered the claims was addressed as well: "The Arbitrator, and not any federal, state, or local court, or agency, shall have

exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability, or waiver of this Arbitration Agreement." *Id*. at ¶ 1(A).

In support of its motion, PAMB submitted a declaration from Bobby Ratzlaff, a manager for PAMB's Professional Employer Organization, Insperity. (ECF No. 6-4).  Ms. Ratzlaff's declaration outlines the secure process that Defendants say Bianchi had to follow to access the Insperity system and to sign the arbitration agreement.  (ECF No. 6-4, PageID.110-111, ¶¶ 12; 16-19). This process included Bianchi creating and using his "unique Login ID, 'mbianchi2000,' and Person ID, '3590981,' on December 29, 2020, to login into Insperity and sign the Arbitration Agreement.  *Id*. at PageID.109, ¶ 12. This authentication process required Bianchi to enter "key personal data to ensure the integrity of the process and his identity," after which he "was presented with various onboarding  documents to review and sign, including the Mutual Arbitration Agreement." *Id*. at ¶ 14.  Ms. Ratzlaff averred that "every agreement an employee signs on Insperity's portal can only be executed by the employee following an input of the employee's unique credentials." *Id*. at ¶ 16.

6

Defendants also point out that Bianchi had the ability to opt out of the arbitration agreement.  According to Defendants, Bianchi was explicitly advised that he "will not be subject to any adverse employment action as a consequence of opting out." *Id*.  Defendants offer evidence that Bianchi did not opt out of the arbitration agreement.  (ECF No. 6-4, Ex. C).

Section 1(E) of the arbitration agreement requires parties to participate in mediation before invoking any binding arbitration requirement under the Agreement.  *Id*. at ¶ 1(E).  According to Defendants, the parties did so pursuant to the unsuccessful EEOC mediation that occurred in August of 2024.

Bianchi offers a different version of events.  He states in his declaration that he never signed the arbitration agreement proffered by Defendants.  (ECF No. 8-2, Bianchi Decl., ¶ 24).  Bianchi also outlines his extensive involvement with the Insperity process.  More specifically, at the end of 2020, Bianchi, Dr. Ghorieshi, and Reza Ghorieshi decided to contract Insperity to support human resources and payroll functions at PAMB.  (ECF No. 8-2, ¶¶ 5-8).  Bianchi was the executive responsible for this engagement.  He oversaw negotiations with and the transition to Insperity during November and December 2020.  *Id*. at ¶ 8.  Insperity sent Bianchi documents to review and

checklists of action items to complete before the "go live" date.  Insperity and Bianchi had constant calls and meetings.  *Id*. at ¶¶ 9, 12.  All communications with Insperity went through Bianchi.  *Id*. at ¶¶ 8-9, 12.  According to Bianchi, at no point in this process did Insperity discuss with him that PAMB and its employees would be bound to arbitrate any disputes with Insperity and with each other, nor did Insperity present an arbitration agreement for Bianchi's review.  *Id*. at ¶¶ 13-14, 23-29.  Bianchi says that he never signed any arbitration agreement on PAMB's behalf, nor did any of its other executives or principals ever communicate that they had done so.  *Id*. at ¶¶ 15-18, 24.

PAMB went live on Insperity's platform in late December 2020.  *Id*. at ¶ 19.  At that point, employees, including Bianchi, were instructed to complete Insperity's onboarding process.  *Id*. at ¶ 20.  Bianchi says he clearly recalls the onboarding process.  *Id*. at ¶ 21.  He maintains that he carefully reviewed each question and document.  But he avers that he never reviewed any arbitration agreement or signed or otherwise took any action to assent to any arbitration agreement.  *Id*. at ¶¶ 22-29.  According to Bianchi, the very first time he ever saw the arbitration agreement was in August 2024, shortly before the EEOC mediation.  *Id*. at ¶ 29.

## III.   ANALYSIS

A.    <u>Legal Standards</u>

On one hand, the parties both assert the motion here was brought under Rule 12(b)(6) and thus, the court cannot look outside the complaint. On the other hand, both parties offer extensive evidence, including several declarations for the court's consideration.  The court can and will consider the evidence proffered by the parties, as explained below.

Where a motion seeks to compel arbitration, the court must start by looking at the procedures provided by the Federal Arbitration Act (FAA).  *See Proch v. King*, No. 2:22-CV-12141, 2023 WL 4940527, at *2 (E.D. Mich. May 5, 2023), *report and recommendation accepted in relevant part, Proch v. King*, No. 22-12141, 2023 WL 4936695, at *3 (E.D. Mich. Aug. 2, 2023) ("*Boykin*[1] explained that the FAA itself, not the Rules of Civil Procedure, provide the starting point for determining how a party should invoke the FAA ... That is because the FAA supplants conflicting Federal Rules of Civil Procedure."). Under the FAA, a party may enforce an arbitration agreement using one of two mechanisms: "a stay of litigation in any case raising a dispute referable to arbitration" pursuant to 9 U.S.C. § 3, or "an affirmative order to engage in arbitration," pursuant to 9 U.S.C. § 4.  *Moses H. Cone Mem'l Hosp. v. Mercury*

---

[1] *Boykin v. Fam. Dollar Stores of Michigan, LLC,* 3 F.4th 832, 844 (6th Cir. 2021).

*Constr. Corp.*, 460 U.S. 1, 22 (1983).  "While § 4 is commonly invoked by plaintiffs who wish to compel breaching parties to cooperate in arbitration, the Supreme Court has held that defendants may also compel arbitration through § 4 after a plaintiff has filed suit in federal court."  *Proch*, 2023 WL 4940527 at *2 (citing *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 837 (6th Cir. 2021) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* 388 U.S. 395, 404 (1967))).

Motions to dismiss based on the existence of a valid arbitration agreement are typically governed by § 4 of the FAA, even if § 4 is not cited.  9 U.S.C. § 4; *see also Boykin*, 3 F.4th at 837 ("Family Dollar's motion is best read as one partially under § 4 because it sought to compel Boykin to arbitrate (although it also sought to dismiss Boykin's complaint and did not cite § 4)"); *Proch*, 2023 WL 4936695 at *2 (finding "[defendant's] 'motion to dismiss' was properly understood as a motion to enforce arbitration under § 4 of the Federal Arbitration Act.").  Section 4 of the FAA requires a court to summarily compel arbitration upon a party's request, unless the opposing side has put the making of the arbitration contract "in issue."  *Boykin*, 3 F.4th at 835 (citing 9 U.S.C. § 4).  An agreement's validity is "in issue" when "the party opposing arbitration ... show[s] a genuine issue of material fact as to the validity of the

agreement to arbitrate."  *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002).  "The required showing mirrors that required to withstand summary judgment in a civil suit."  *Id*.  Thus, the court views "all facts and inferences drawn therefrom in the light most favorable" to the party opposing arbitration and "determine[s] whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists."  *Id*.  If the court finds that the making of the arbitration agreement is "in issue," the court "shall proceed summarily to the trial on the disputed question."  9 U.S.C. § 4.  Additionally, "a party who adequately puts the formation of an arbitration contract in issue may request discovery on that contract-formation question."  *Boykin*, 3 F.4th at 841.

Alternatively, if the opposing party fails to place the validity of the agreement "in issue," it must be enforced as written.  9 U.S.C. § 4 ("the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *Proch v. King*, 2023 WL 4940527, at *2 ("Simply put, the statute compels parties to honor their arbitration agreements.").  While the FAA evidences a "strong federal policy in favor of arbitration," this "does not authorize federal courts to invent special, arbitration-preferring procedural rules.  *Morgan v. Sundance, Inc.*, 596 U.S.

11

411, 418 (2022) (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). As such, arbitrations must be "as enforceable as other contracts, but not more so." *Id.* (citing *Prima Paint Corp.*, 388 U.S. at 404 n.12 ("Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind.").

B.      The *Boykin* Standard

In opposition to Defendants' motion, Bianchi argues that the court cannot compel arbitration because there is a legitimate dispute as to whether the parties have an agreement to arbitrate. To determine whether their arguments are sufficient to place the validity of the arbitration agreement "in issue," the court will rely on the standards set forth in *Boykin v. Family Dollar Stores of Michigan, LLC.* In *Boykin*, the Sixth Circuit compared the facts of two different cases to illustrate when a plaintiff has presented sufficient information to create a "genuine dispute" about the validity of an arbitration agreement. 3 F.4th at 840. Generally, the Sixth Circuit found that "convenient memory lapses do not create factual disputes that are genuine" and "[a] party thus cannot expect to obtain a trial under § 4 simply by testifying that the party does not 'remember' signing an arbitration contract or receiving information about an arbitration." *Id.* To illustrate this point, the

12

Sixth Circuit cited *Tinder v. Pinkerton Sec.*  In *Tinder*, the plaintiff "argued that she had not accepted arbitration through her employment with Pinkerton Security because she did not receive materials announcing the arbitration policy."  305 F.3d 728 (7th Cir. 2002).  However, the defendant provided evidence that the materials were "definitely sent" to Tinder.  *Id.* at 736.  Tinder's only evidence in opposition included an affidavit stating that she "did not 'recall' getting them," which was insufficient to create a genuine dispute.  *Id.*

On the other hand, the Sixth Circuit held that an "'unequivocal denial' that takes the form of admissible 'evidence' can create a genuine issue of material fact."  *Boykin*, 3 F.4th at 840.  To illustrate this point, the Sixth Circuit cited *Camara v. Mastro's Restaurants, LLC*.  In *Camara*, the plaintiff's employer testified that "virtually every" employee was required to sign the arbitration agreement and Camara's personnel records showed he had, in fact, done so.  952 F.3d 372, 374 (D.C. Cir. 2020).  However, Camara testified "he had not seen or signed the agreement and was not aware of any arbitration policy."  *Id*.  The court found this conflicting evidence, including the question of whether Camara fell within the category of "virtually every employee," necessitated a trial under § 4.  *Id*. at 374-75.

13

The Sixth Circuit noted that the evidence in *Boykin* fell "between the evidence in *Tinder* and *Camara*. *Boykin*, 3 F.4th at 340. Boykin testified that he "does not 'have knowledge or recollection' of accepting the arbitration contract or taking the arbitration session." *Id*. Subject to the penalties for perjury, he testified: "'I unequivocally did not consent to sign, acknowledge, or authorize any type of arbitration agreement with [Family Dollar] on or after July 15, 2013 or at any time." *Id*. He also "flatly denied receiving information about arbitration: 'I was not informed by [Family Dollar] that I was required to enter into an arbitration agreement as a condition of my employment.'" *Id*. The defendant produced Boykin's personnel file which included "all available records," but did not include any arbitration-related records. *Id*. The Sixth Circuit reasoned that "[t]he 'absence' of these materials from Boykin's personnel file offers some relevant evidence supporting him" and found that "Boykin has identified a genuine dispute of fact over whether the parties have formed a contract – a dispute that entitles him to targeted discovery and a trial on the question." *Id*.

C.      Validity of the Arbitration Agreement

As explained in *Boykin*, "to determine whether the validity of an arbitration agreement is 'in issue' under § 4, courts must utilize the summary

judgment standard borrowed from Rule 56." *Boykin*, 3 F.4th at 838 (citations omitted).  ("we and many courts have held that Rule 56's standards govern whether a court should hold a trial under § 4 when a party alleges that no contract exists.").  Under Rule 56, the key question is whether there is a "genuine dispute as to any material fact" when construing the facts "in the light most favorable to the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Consistent with Rule 56's standards, the party seeking to compel arbitration has the initial burden to present evidence that would allow a trier of fact to find all required elements of a contract, including the Plaintiffs' acceptance.  *Boykin*, 3 F.4th at 839 ("Under Rule 56, Family Dollar had the initial duty to present evidence that would allow a trier of fact to find all required elements of a contract").  The court must limit this inquiry to whether a valid agreement to arbitrate exists, not whether the entire contract itself is valid.  *Great Earth Cos., Inc.*, 288 F.3d at 889 ("The Supreme Court has explained that in deciding whether a valid agreement to arbitrate exists, district courts may consider only claims concerning the validity of the arbitration clause itself, as opposed to the validity of the contract as a whole).

To determine whether a valid arbitration agreement exists, the court "appl[ies] ordinary state-law principles that govern the formation of

15

contracts." *Chaudhri v. StockX, LLC (In re StockX Customer Data Sec. Breach Litig.)*, 19 F.4th 873, 881 (6th Cir. 2021).  The parties agree that Michigan law governs this dispute.  Under Michigan law, "an acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Kloian v. Domino's Pizza, L.L.C.*, 273 Mich. App. 449, 453-54 (2006).

Defendants have met their initial burden to demonstrate that a contract exists.  Ms. Ratzlaff's declaration outlines the secure process that Defendants say Bianchi had to follow to access the Insperity system and to sign the arbitration agreement.  (ECF No. 6-4, PageID.110-111, ¶¶ 12; 16-19). This process included Bianchi creating and using his "unique Login ID, 'mbianchi2000,' and Person ID, '3590981,' on December 29, 2020, to login into Insperity and sign the Arbitration Agreement.  *Id*. at PageID.109, ¶ 12. According to Ms. Ratzlaff, this authentication process required Bianchi to enter "key personal data to ensure the integrity of the process and his identity," after which he "was presented with various onboarding  documents to review and sign, including the Mutual Arbitration Agreement."  *Id*. at ¶ 14.

16

Ms. Ratzlaff averred that "every agreement an employee signs on Insperity's portal can only be executed by the employee following an input of the employee's unique credentials." *Id*. at ¶ 16.

Because Defendants have met their initial burden to demonstrate a contract exists, Bianchi now has the burden to present "specific facts, as opposed to general allegations," that would allow a rational trier of fact to find that he did not agree to the arbitration provision. *Boykin*, 3 F.4th at 839. The court finds that Bianchi has done so. Bianchi unequivocally states that he never signed the arbitration agreement proffered by Defendants. (ECF No. 8-2, Bianchi Decl., ¶ 24). Bianchi also describes his extensive involvement with the Insperity process, which he says never revealed any arbitration agreement. Bianchi was the executive responsible for the Insperity engagement and he oversaw negotiations with and the transition to Insperity during November and December 2020. *Id*. at ¶ 8. Insperity sent Bianchi documents to review and checklists of action items to complete before the "go live" date. Bianchi says that all communications with Insperity went through him. *Id*. at ¶¶ 8-9, 12. According to Bianchi, at no point in this process did Insperity discuss with him that PAMB and its employees would be bound to arbitrate any disputes with Insperity and with each other, nor did

17

Insperity present an arbitration agreement for Bianchi's review.  *Id*. at ¶¶ 13-14, 23-29.

Bianchi also says he clearly recalls the Insperity onboarding process. *Id*. at ¶ 21.  He maintains that he carefully reviewed each question and document.  But he avers that he never reviewed any arbitration agreement or signed or otherwise took any action to assent to any arbitration agreement. *Id*. at ¶¶ 22-29.  Bianchi states in his declaration that he did not digitally sign the arbitration agreement presented by Defendants.  *Id*. at ¶ 27.  According to Bianchi, the very first time he ever saw the arbitration agreement was in August 2024, shortly before the EEOC mediation.  *Id*. at ¶ 29.

The foregoing dispute is remarkably similar to that in *Bazemore v. Papa John's U.S.A., Inc*., 74 F.4th 795 (6th Cir. 2023), where the court found a question of fact.  In *Bazemore*, as here, the defendant seeking to enforce the arbitration agreement pointed to the electronic signature of the plaintiff, Bazemore, who argued that he did not agree to the arbitration provision.  74 F.4th at 798. Bazemore submitted a sworn declaration in which he said he never saw the arbitration agreement and "had never heard about it."  *Id*. at 797-98. Notwithstanding testimony from the defendant that the electronic document containing the arbitration agreement required Bazemore to scroll

through the entire agreement before signing it, "Bazemore's testimony that he never saw the agreement was ... enough to create a genuine issue as to whether he signed it." *Id*. at 798.

Bianchi, like the plaintiff in *Bazemore*, testified under penalty of perjury, that he never saw or signed the arbitration agreement.  Under *Bazemore*, Bianchi's sworn declaration creates a genuine issue of fact as to whether he agreed to the arbitration agreement.  In their reply, Defendants urge the court to follow *Anderson v. Crothall Healthcare, Inc*., 2022 WL 3719834 (E.D. Mich. Aug. 29, 2022), in which the court concluded that a party's own assertion, without evidentiary support, is not sufficient to create a genuine issue of material fact as to the legitimacy of an electronic signature.  However, this unpublished decision was issued before the Sixth Circuit's decision in *Bazemore* and the court does not find it persuasive, given the contrary holding in *Bazemore*.

Additionally, in its supplemental brief on *Bazemore*, Defendants make several arguments regarding why the court should not follow *Bazemore* here.[2] First Defendants argue that because they filed a motion under Rule 12(b)(6),

---

[2] At oral argument, the court gave the parties the opportunity to file supplemental briefs addressing the *Bazemore* decision.  They both did so.  (ECF Nos. 13, 14).

the court may not consider Bianchi's declarations.  However, as discussed

above, because *both* parties submitted declarations and other evidence, the

court will consider the motion as one to compel arbitration under § 4 of the

FAA.  *See*, § III.A.

Second, Defendants argue the plaintiff in *Bazemore* alleged facts

attacking the security and reliability of the plaintiff's e-signature and it was

these facts that created the genuine issue of material fact.  And here,

Defendants say Plaintiff offers no facts disputing the security and reliability of

his electronic signature on the arbitration.  However, on review of the

*Bazemore* decision, the security and reliability issues do not appear to be

what created the material factual issue as found by the court.  Instead, the

court focused on the conflicting evidence regarding whether there was a valid

electronic signature:

> Here, the parties presented conflicting evidence on
> that point. Papa John's pointed to an e-Form record of
> the arbitration agreement. That record has
> Bazemore's name typed at the bottom with an
> electronic signature "By UserID: 467073"—which
> Greene says is Bazemore's user ID. Yet Bazemore
> submitted a sworn declaration in which he repeatedly
> said that he never saw the arbitration agreement—
> even though, as Greene said, the e-Form would have
> required him to scroll through the entire agreement
> before signing it. We see no reason whatever that

20

would prevent a reasonable factfinder from believing Bazemore's testimony—which means that his testimony created a genuine issue of material fact. *See Boykin*, 3 F.4th at 841.

*Bazemore*, 74 F.4th at 798.  Further, the court held that "on the record here, a reasonable factfinder could plainly infer that, if Bazemore had not seen the agreement, he had not signed it either.  Bazemore's testimony that he never saw the agreement was therefore enough to create a genuine issue as to whether he signed it." *Id*.  The finding of a question of fact does not appear to have depended on the security and reliability issues otherwise identified by the plaintiff and thus, the court concludes that Bianchi need not have also identified security and reliability issues in order to create a genuine issue of material fact.

Third, Defendants argue that because *Bazemore* applied Kentucky law, not Michigan law, it is distinguishable.  Defendants point to *Carroll v. Progressive Michigan Ins. Co.*, 2025 WL 1122507, at *6 (Mich. Ct. App. Apr. 15, 2025) in support of their argument.  In *Carroll*, the Michigan Court of Appeals rejected the policyholder's affidavit that directly asserted he did not e-sign any document to opt out of medical benefits.  The policyholder had not disputed his e-signature on the remainder of the other application

21

documents.  With a validly signed application using security measures as required under Michigan's UETA, the Michigan Court of Appeals rejected the policyholder's attempt to undermine his legally enforceable e-signature for a single page.  According to Defendants, this is comparable to the instant matter given Plaintiff recognizes and acknowledges the e-signature Insperity process for his unique login information except his Arbitration Agreement.

The court finds the facts here distinguishable from *Carroll*.  In *Carroll*, the court found that the affidavit did not create a question of faction regarding the validity of his opt-out.  The court noted that the form completed by the affiant met all the statutory requirements under the UETA and his "conclusory denial" in the affidavit did not set forth with any particularity any specific facts to establish a genuine issue of material fact "whether [he] did in fact electronically sign and initial the insurance application and PIP-selection form." *Id*. at *8.  Further, the affiant's historical conduct contradicted the substance of the affidavit in that he paid lower premiums for the months preceding the accident, "exhibiting behavior in accordance with the selections made through his statutorily-valid e-signatures." *Id*.  Accordingly, the conclusory affidavit did not avoid summary disposition based on the

22

historical conduct and signed documentary evidence in the form of the repeated signatures and initials throughout the insurance documents.  *Id*.

Here, in contrast, Defendants do not point to any historical conduct of Bianchi that is consistent with his signing the arbitration agreement.  And more importantly, Bianchi offers more than conclusory assertions that he specifically did not sign the arbitration agreement.  Of course, Bianchi unequivocally states that he never signed the arbitration agreement proffered by Defendants, which by itself, would not be sufficient under *Carroll*.  (ECF No. 8-2, Bianchi Decl., ¶ 24).  Bianchi also provides additional facts establishing two things: (1) he was extensively involved with the Insperity process, which he says never revealed any arbitration agreement; and (2) he provides a far more detailed explanation regarding his claim that he did not sign the arbitration agreement in particular.  As to the first matter, Bianchi was the executive responsible for the Insperity engagement and he oversaw negotiations with and the transition to Insperity during November and December 2020.  *Id*. at ¶ 8.  Insperity sent Bianchi documents to review and checklists of action items to complete before the "go live" date.  Bianchi says that all communications with Insperity went through him.  *Id*. at ¶¶ 8-9, 12.  According to Bianchi, at no point in this process did Insperity discuss with him

that PAMB and its employees would be bound to arbitrate any disputes with Insperity and with each other, nor did Insperity present an arbitration agreement for Bianchi's review. *Id*. at ¶¶ 13-14, 23-29.

As to the second matter, Bianchi does not merely state that he did not sign the arbitration agreement. Bianchi also says he clearly recalls the Insperity onboarding process. *Id*. at ¶ 21. He maintains that he carefully reviewed each question and document. But he avers that he never reviewed any arbitration agreement or signed or otherwise took any action to assent to any arbitration agreement. *Id*. at ¶¶ 22-29. Bianchi states in his declaration that he did not digitally sign the arbitration agreement presented by Defendants. *Id*. at ¶ 27. According to Bianchi, the very first time he ever saw the arbitration agreement was in August 2024, shortly before the EEOC mediation. *Id*. at ¶ 29.

Based on the foregoing averments in Bianchi's affidavit, the court finds that it contains more than mere conclusory denials that he did not sign the arbitration agreement, and thus, the present circumstances are distinguishable from *Carroll*.

Bianchi has sufficiently placed the formation and his alleged signing of the arbitration agreement in issue. *See Bazemore*, 74 F.4th at 798. "Because

24

summary judgment (and, by extrapolation, a motion to compel arbitration under 9 U.S.C. § 4) can be supported or defeated by citing a developed record, the court must allow adequate discovery on formation issues before resolving [Defendants'] motion to compel arbitration." *Dillard v. Canal St. Brewing Co.*, No. 23-CV-11019, 2024 WL 448784, at *3 (E.D. Mich. Feb. 6, 2024) (citing *Fania v. KIN Insurance, Inc.*, 2023 WL 3587753, at *4 (E.D. Mich. May 22, 2023) (citing *Boykin*, 3 F.4th at 842)).

D.    Plaintiff's Request to Expand Scope of Trial

Plaintiff contends that there is a valid settlement agreement between the parties.  Further, should this matter proceed to a "mini-trial" on the question of formation of the arbitration agreement, Plaintiff also requests that such trial include within its scope the formation of the settlement agreement as well.  Defendants object to this request, asserting that the court must first decide whether an arbitration agreement exists so that the court can determine *who* decides whether a settlement agreement exists.  The Sixth Circuit has held that where a motion to compel arbitration is opposed on the ground that there is no valid or enforceable arbitration agreement, the district court "was required to first rule on [the] arbitration motion because, once a motion to compel arbitration is filed, 'the district court [must] refrain from

25

further action' and must 'first determine whether there is a written agreement to arbitrate between the parties[.]'" *Southard v. Newcomb Oil Co., LLC*, No. 19-5187, 2019 WL 8111958, at *4 (6th Cir. Nov. 12, 2019) (quoting *Midwest Mech. Contractors, Inc. v. Commonwealth Const. Co.*, 801 F.2d 748, 750 (5th Cir. 1986)).  Given that discovery is necessary on the issue of arbitration contract formation, the court finds that it would be premature at this point to address the issue of whether a settlement agreement exists.  That is, the court must determine first whether the parties' dispute is subject to arbitration.  If so, then the court will determine whether the issue of any settlement agreement formation falls within the arbitrator's purview or the court's purview.  The court will provide further direction on briefing this issue after the arbitration issue is fully resolved.

E.      Plaintiff's Motion to Seal and Defendant's Motion to Strike

Plaintiff has filed a motion to seal/redact voluminous documents relating to his position that the parties entered into a binding settlement agreement.  (ECF No. 16, 17).  These documents do not appear to be related to any motion currently pending on the docket, but are related to Plaintiff's claim in this lawsuit that the alleged settlement agreement should be enforced.  In response, Defendants filed a motion to strike Plaintiff' Exhibit A

(ECF No. 16-2) and Exhibit B (ECF No. 17).  Defendants argue that there is no compelling reason, as required by Local Rule 5.3, to permit Plaintiff to place these documents in the record, whether sealed or not.  (ECF No. 18).  This is so, according to Defendants, because the documents have nothing to do with the issue currently pending before the court: whether Plaintiff signed the arbitration agreement.

As explained above, the court is required to resolve the arbitration issue before it may proceed to resolve any other issues in this case.  The court finds that the settlement-related materials were prematurely filed on the docket and are unrelated to the arbitration issue currently pending before the court. Accordingly, the court will **GRANT** the motion to strike these materials (ECF No. 18) and **DENY** the motion to seal as moot (ECF No. 16).  *See Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1307-08 (E.D. Mich. 2021) (Granting motion to strike materials considered unrelated to motion pending before the court and denying motion to seal as moot).

**IV.    CONCLUSION**

The court will permit the parties to conduct limited discovery on formation issues related to the arbitration agreement and Bianchi's alleged electronic signature.  The parties may supplement their briefing on

Defendants' motion to dismiss and to compel arbitration on completion of the limited discovery.  Based upon the supplemental briefing, the court will determine if it must compel arbitration or "proceed summarily" to a trial on remaining disputed factual issues regarding formation.  *See* 9 U.S.C. § 4.

Therefore, Defendant's motion to dismiss and to compel arbitration (ECF No. 6) is **HELD IN ABEYANCE**.  *See Boykin*, 3 F.4th at 844.  Discovery for the limited purpose of addressing the arbitration agreement formation and electronic signature issues will be permitted until **August 24, 2026**.  The parties must submit any supplemental briefs by **September 7, 2026**.

**SO ORDERED**.

Date: June 24, 2026                         s/F. Kay Behm
                                            F. Kay Behm
                                            United States District Judge